1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

10

SOUTHERN DISTRICT OF CALIFORNIA

| STANFORD PAUL BRYANT, | ) | Civil No. 08cv02318 W(RBB) |
|---|---|---|
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **GRANTING IN PART AND DENYING** |
| v. | ) | **IN PART DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT [ECF NO. 91]** |
| T. ARMSTRONG, Correctional | ) | **AND DENYING PLAINTIFF'S MOTION** |
| Officer; et al., | ) | **FOR SUMMARY JUDGMENT [ECF NO.** |
| | ) | **92]** |
| Defendants. | ) | |

Plaintiff Stanford Paul Bryant, a state prisoner proceeding
pro se and in forma pauperis, filed a Complaint on December 12,
2008 [ECF No. 1], and a First Amended Complaint on March 3, 2009
[ECF No. 3], pursuant to 42 U.S.C. § 1983.  The ten named
Defendants moved to dismiss Plaintiff's First Amended Complaint
[ECF Nos. 15, 18].  The Court issued a Report and Recommendation
Granting in Part and Denying in Part Defendants' Motion to Dismiss
Plaintiff's First Amended Complaint [ECF No. 27].  United States
District Court Judge Thomas Whelan subsequently adopted the Report
and Recommendation [ECF No. 37].

The Plaintiff filed a Second Amended Complaint on June 23, 2010 [ECF No. 39].[1]  All ten Defendants moved to dismiss the Second Amended Complaint [ECF No. 40], which was granted in part and denied in part [ECF Nos. 46-47].  The six remaining Defendants, Armstrong, Catlett, Janda, Lizarraga, Ochoa, and Trujillo, then filed an Answer [ECF No. 49].

On December 23, 2011, Defendants' Motion for Summary Judgment was filed, along with a Memorandum of Points and Authorities and the declarations of Tammy Armstrong, G. Janda, G. Trujillo, T. Catlett, T. Ochoa, and R. Lizarraga [ECF No. 91].  Plaintiff's Motion for Summary Judgment and exhibits were filed the same day [ECF No. 92].  The Court issued a <u>Klingele/Rand</u> Notice on January 4, 2012, advising Bryant of the need to submit evidence in opposition to Defendants' Motion [ECF No. 93].  On February 17, 2012, "Defendants' Notice to Court Re: Opposition to Plaintiff's Motion for Summary Judgment" was filed, in which Defendants ask the Court to consider all evidence and facts submitted in their summary judgment motion as also in opposition to Plaintiff's Motion for Summary Judgment [ECF No. 96].  Plaintiff's Opposition to Defendants' Motion for Summary Judgment was filed on March 26, 2012, along with exhibits [ECF No. 101].

---

[1]  Bryant's Second Amended Complaint [ECF No. 39], the documents attached to Defendants' Motion for Summary Judgment [ECF No. 91], Plaintiff's Motion for Summary Judgment [ECF No. 92], Plaintiff's Opposition to Defendants' Motion for Summary Judgment [ECF No. 101], Plaintiff's Supplemental Memorandum of Points and Authorities in Support of Opposition to Defendants' Motion for Summary Judgment [ECF No. 113], and the Supplemental Declaration of Stanford P. Bryant in Support of Opposition to Defendant's Motion for Summary Judgment [ECF No. 115] are not consecutively paginated. The Court will cite to all these filings using the page numbers assigned by the electronic docketing system.

08cv02318 W(RBB)

The "Supplemental Memorandum of Points and Authorities in Support of Opposition to Defendant's Motion for Summary Judgment" was filed nunc pro tunc to July 19, 2012 [ECF No. 113]. The "Supplemental Declaration of Stanford P. Bryant in Support of Opposition to Defendant's Motion for Summary Judgment" was filed nunc pro tunc to the same day, along with exhibits [ECF No. 115]. In his latest filing, Plaintiff indicates that he recently received supplemental discovery responses from Defendants in light of the Court's order compelling the discovery. (Pl.'s Suppl. Mem. P. & A. Opp'n Defs. Mot. Summ. J. 2, ECF No. 113.) The Defendants responded on August 1, 2012, and filed Defendants' Reply to Plaintiff's Supplemental Memorandum of Points and Authorities [ECF No. 116].

The Court has reviewed the Second Amended Complaint, Defendants' Motion for Summary Judgment, Bryant's Motion for Summary Judgment, Plaintiff's Opposition, Plaintiff's Supplemental Memorandum and Declaration, and Defendants' Reply. Both summary judgment motions are suitable for resolution on the papers, pursuant to Civil Local Rule 7.1. See S.D. Cal. Civ. R. 7.1(d)(1). For the reasons stated below, Defendants' Motion for Summary Judgment should be **GRANTED in part** and **DENIED in part**. Bryant's Motion for Summary Judgment should be **DENIED**.

## I. FACTUAL BACKGROUND

Plaintiff's allegations arise from events that occurred while he was incarcerated at Calipatria State Prison ("Calipatria"). (Pl.'s Mot. Summ. J. 7, ECF No. 92.)

//

//

**A.    Count One:  Equal Protection (Defendant Armstrong)**

In count one, Bryant argues that Defendant Armstrong violated the Equal Protection Clause by discriminating against him because of his race.  (<u>Id.</u> at 11, 13; <u>see</u> Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 6, ECF No. 91.)  He claims that during the eight months Armstrong was "ASU #2's Legal Officer," she scheduled Bryant and other African-American inmates to attend the law library during times they were assigned to yard recreation.  (Pl.'s Mot. Summ. J. 11, 13, ECF No. 92; <u>see</u> Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 19, ECF No. 91.)  Notably, Armstrong scheduled Hispanic prisoners to law library time when it did not interfere with their yard time.  (<u>Id.</u>)

**B.    Count Two:  Retaliation (Defendant Armstrong)**

Bryant argues in count two that on January 28, 2008, Defendant Armstrong violated the First Amendment by retaliating against him for exercising his First Amendment rights.  (Pl.'s Mot. Summ. J. 15, ECF No. 92; <u>see</u> Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 6, ECF No. 91.)  Plaintiff claims that Armstrong overheard him helping another inmate prepare a grievance against her, and she accused Bryant of "snitching" on her in front of other inmates.  (Pl.'s Mot. Summ. J. 15, ECF No. 92; <u>see</u> Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 22-23, ECF No. 91.)  Plaintiff verbally complained and then submitted a grievance against Armstrong; she retaliated by filing a false informational chrono against him on January 28, 2008, that is incorrectly dated February 7, 2008.  (<u>Id.</u>)

//

//

//

**C.   Count Three:   Equal Protection and Retaliation (Defendants Lizarraga, Trujillo, Catlett, Ochoa, and Janda)**

The Plaintiff argues in count three that Defendants Lizarraga and Trujillo violated the First and Fourteenth Amendments by retaliating and discriminating against him.  (Pl.'s Mot. Summ. J. 13-14, 16-19, ECF No. 92; see Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 6, ECF No. 91.)  Defendants Catlett, Janda, and Ochoa violated the First Amendment by retaliating against Plaintiff. (Pl.'s Mot. Summ. J. 17-20, ECF No. 92; see Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 6, ECF No. 91; see also Second Am. Compl. 41-42, ECF No. 39.)

In particular, Plaintiff asserts that after he and another inmate submitted grievances against Armstrong, Defendant Lizarraga retaliated against Bryant and other African-American inmates by moving them to more restrictive cell placements, threatening Plaintiff, and filing a false rules violation report against Bryant.  (Pl.'s Mot. Summ. J. 8, 16-17, ECF No. 92; see Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 24, ECF No. 91.)  Lizarraga's actions are also alleged to violate the Equal Protection Clause. (See Second Am. Compl. 25-30, ECF No. 39; Pl.'s Mot. Summ. J. 8, 13-14, ECF No. 92.)  Further, Defendant Trujillo retaliated against Plaintiff by refusing to allow Bryant to call witnesses at his disciplinary hearing and by falsifying the corresponding disciplinary report.  (Pl.'s Mot. Summ. J. 18-19, ECF No. 92; see Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 26, ECF No. 91.) Bryant contends that Trujillo's actions also constituted racial discrimination.  (Pl.'s Mot. Summ. J. 8, 14, ECF No. 92.)

08cv02318 W(RBB)

1    Finally, Defendants Catlett, Ochoa, and Janda purportedly
2    retaliated against Plaintiff by ratifying Defendants Armstrong,
3    Lizarraga, and Trujillo's discriminatory conduct.  (Id. at 17-20
4    (asserting that Defendants Catlett and Janda retaliated in this
5    manner); see Second. Am. Compl. 41-42, ECF No. 39 (alleging that
6    Defendants Catlett, Janda, and Ochoa retaliated by endorsing the
7    other Defendant's discriminatory actions); see also Defs.' Mot.
8    Summ. J. Attach. #1 Mem. P. & A. 27, ECF No. 91.).)

9  **D.   Count Four:  California Civil Code (Defendants Armstrong,**
10      **Lizarraga, and Trujillo)**

11    In count four, Plaintiff alleges that Defendants Armstrong,
12   Lizarraga, and Trujillo violated California Civil Code sections
13   52.1, 51.7, and 52(b) by interfering with Bryant's constitutional
14   rights because of his race.  (Defs.' Mot. Summ. J. Attach. #1 Mem.
15   P. & A. 6, 29, ECF No. 91; see Pl.'s Opp'n Defs.' Mot. Summ. J.
16   28-30, ECF No. 101.)  Armstrong and Lizarraga threatened Plaintiff
17   with violence if he continued to submit grievances alleging racial
18   discrimination.  (Pl.'s Opp'n Defs.' Mot. Summ. J. 29-30, ECF No.
19   101.)  Bryant argues that Lizarraga "committed an act of violence"
20   against him by removing legal documents from his cell without
21   permission.  (Id. at 30.)  Similarly, he contends that Defendant
22   Trujillo intimidated Plaintiff by having approximately three
23   Hispanic officers surround him in a "menacing manner."  (Id.)

24       **II.   LEGAL STANDARDS FOR SUMMARY JUDGMENT MOTIONS**

25    Federal Rule of Civil Procedure 56(c) provides, "The court
26   shall grant summary judgment if the movant shows that there is no
27   genuine dispute as to any material fact and the movant is entitled
28   to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Like the

standard for a directed verdict, judgment must be entered for the moving party "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (citing Brady v. S. Ry. Co., 320 U.S. 476, 479-80 (1943)).  "If reasonable minds could differ as to the import of the evidence," judgment should not be entered in favor of the moving party.  Id. at 250-51; see also Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir. 2007).

The parties bear the same substantive burdens of proof that would apply at a trial, including plaintiff's burden to establish any element essential to his case.  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Liberty Lobby, Inc., 477 U.S. at 252; see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  "When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'"  Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex Corp., 477 U.S. at 322).  The absence of a genuine issue of material fact on an essential element of a party's case is sufficient to warrant summary judgment for the opposing party. Celotex Corp., 477 U.S. at 322-23.

For those issues on which it has the burden of proof, the moving party bears the initial task of identifying the pleadings and evidence it "believes demonstrate the absence of a genuine issue of material fact."  Id. at 323; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Martinez v. Stanford, 323 F.3d 1178, 1182-83 (9th Cir. 2003).  The burden then shifts to the

nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.  See Celotex Corp., 477 U.S. at 324.

To successfully rebut a defendant's properly supported motion for summary judgment, the plaintiff "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff[']s[] favor, could convince a reasonable jury to find for the plaintiff[]." Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 323; Liberty Lobby, Inc., 477 U.S. at 249).  Material issues are those that "might affect the outcome of the suit under the governing law." Liberty Lobby, Inc., 477 U.S. at 248; accord Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1039-40 (9th Cir. 2000); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  More than a "metaphysical doubt" is required to establish a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether any genuine issue of material fact remains for trial, courts must "view[] the evidence in the light most favorable to the nonmoving party . . . ." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001); see also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992) (stating that the nonmoving party's evidence is to be believed and all reasonable inferences drawn in the nonmoving party's favor).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v.

08cv02318 W(RBB)

<u>Harris</u>, 550 U.S. 372, 380 (2007).  While the district court is not required to search the entire record for an issue of fact, the court may nevertheless exercise its discretion to consider materials in the record that are not specifically identified. <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); <u>Forsberg v. Pacific Nw. Bell Tel. Co.</u>, 840 F.2d 1409, 1417-18 (9th Cir. 1988).

When the nonmoving party is proceeding pro se, the court has a duty to consider "all of [the nonmovant's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the nonmovant] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." <u>Jones v. Blanas</u>, 393 F.3d 918, 922-23 (9th Cir. 2004) (citations omitted).

### III.  DISCUSSION

In their Motion for Summary Judgment, Defendants Armstrong, Lizarraga, Trujillo, Catlett, Ochoa, and Janda argue that Bryant's remaining causes of action fail as a matter of law.  (Defs.' Mot. Summ. J. 1, ECF No. 91.)

Armstrong contends that she is entitled to summary judgment on the equal protection claim in count one because there is no evidence that any differential treatment was based on race or that she had a discriminatory intent.  (<u>Id.</u> Attach. #1 Mem. P. & A. 21-22.)  Armstrong also moves for summary judgment on the retaliation claim against her in count two because there is no evidence that she issued the informational chrono against Bryant

for engaging in protected conduct; rather, Armstrong issued it because of Plaintiff's repeated misconduct. (Id. at 23-24.)

Defendant Lizarraga moves for summary judgment on the equal protection and retaliation causes of action against him in count three. (Id. at 24-26.)  Similarly, Defendants Armstrong, Trujillo, Catlett, Ochoa, and Janda contend Bryant cannot establish a triable issue for the retaliation claims against them in count three. (Id. at 26-28.)  Finally, Armstrong, Lizarraga, and Trujillo move for summary judgment on the state law claims asserted by Bryant in count four. (Id. at 29.)

Plaintiff maintains that he is entitled to summary judgment on count one, his claim that Defendant Armstrong violated the Equal Protection Clause by scheduling law library time in a discriminatory manner. (Pl.'s Mot. Summ. J. 11-12, ECF No. 92.) Bryant also argues that his retaliation claim against Armstrong in count two presents no triable issue of fact because the evidence establishes that she knew that he had advised another inmate on how to submit grievances against her. (Id. at 15.)  After Bryant submitted his grievance, Armstrong prepared a false informational chrono against him that is dated February 7, 2008, but Armstrong maintains was submitted on January 28, 2008. (Id. at 15.) Further, Plaintiff seeks summary judgment on his retaliation and equal protection claims against Lizarraga and Trujillo, and his retaliation causes of action against Defendants Catlett and Janda. (Id. at 13-14, 16-20.)

**A.   Count One:  Equal Protection (Armstrong)**

The Supreme Court has stated that "whenever the government treats any person unequally because of his or her [membership in a

protected class], that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 229-30 (1995); see also Damiano v. Florida Parole & Probation Comm'n, 785 F.2d 929, 932-33 (11th Cir. 1986) (explaining that protected classes include race, religion, national origin, and poverty). The same principle applies to inmates. "[P]risoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." Wolf v. McDonnell, 418 U.S. 539, 556 (1974). The equal protection guarantee safeguards not only groups of people, but also individuals who would constitute a "class of one." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

A plaintiff can establish an equal protection violation by demonstrating that the defendant intentionally discriminated on the basis of plaintiff's membership in a protected class, such as race, religion, national origin, and poverty. Barren v. Harrington, 152 F.3d 1193, 1194-95 (9th Cir. 1998); Damiano, 785 F.2d at 932-33. Alternatively, if the state action does not implicate a fundamental right or a suspect classification, a plaintiff can make an equal protection claim by demonstrating that the defendant intentionally treated plaintiff differently from similarly situated individuals without a rational basis for the different treatment. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008); Olech, 528 U.S. at 564.

An equal protection claim based on membership in a protected class does not succeed, and the Fourteenth Amendment is not violated, if the claim relies on unintentional conduct that has a

11

disparate impact.  <u>See</u> <u>Vill. of Arlington Heights v. Metro. Hous.</u>
<u>Dev. Corp.</u>, 429 U.S. 252, 265 (1977); <u>Washington v. Davis</u>, 426 U.S.
229, 239 (1976).  "[A] plaintiff must show that the defendants
acted with an intent or purpose to discriminate against the
plaintiff based upon membership in a protected class." <u>Barren v.</u>
<u>Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998).

   In her Declaration, Defendant Armstrong submits that she was
the "Ad Seg Legal Officer in Administrative Segregation Unit #2,"
or law library officer, from April 2006 to January 2008.  (Defs.'
Mot. Summ. J. Attach. #2 Decl. Armstrong 2, ECF No. 91.)  She was
responsible for scheduling law library sessions for administrative
segregation unit ("ASU") inmates and escorting them from ASU to the
library.  (<u>Id.</u> at 4.)

   ASU #2 inmates were assigned to yard groups that were
determined by Calipatria's "classification staff;" Armstrong was
not involved in making these assignments.  (<u>Id.</u> at 2.)  Yard group
assignments were based on gang affiliations and compatibility, not
race.  (<u>Id.</u> at 3.)  During Armstrong's tenure, there were eight
different yard groups in ASU #2, and each group received three
sessions of outdoor exercise per week.  (<u>Id.</u> at 2.)  There was one
three-hour morning session and one three-hour afternoon session
every day except Thursday.  (<u>Id.</u>)  Defendant states that "[e]ach
yard group was scheduled for outdoor exercise on different yards at
different times."  (<u>Id.</u>)

   According to Armstrong, yard groups one, three, seven, and
eight were made up of prisoners who were part of the "Southern
Hispanic gang," and inmates of various races who were compatible
with that gang, including nonaffiliated inmates.  (<u>Id.</u> at 3.)  The

Southern Hispanic gang included Hispanic and Caucasian inmates. (Id.)  Bryant's group, yard group two, included prisoners who were part of the "Crips" gang, which was comprised mostly of African-American and Samoan inmates.  (Id.)  Yard groups four and six consisted of prisoners who were housed on the "Sensitive Needs Yard."  (Id.)  Finally, yard group five was comprised of "Blood" gang members - mostly African-American inmates - and prisoners who were compatible with the gang.  (Id.)  The basis for Armstrong's hearsay statements is not apparent from her Declaration.

Because there was no law library in ASU #2, inmates had to be escorted and transported to the library; only five inmates could be taken at a time because they had to conduct their work in one of the five separate holding cells inside the library.  (Id. at 3-4.) The law library was available to ASU #2 inmates every Monday from 9:00 a.m. to 11:00 a.m. or from 1:00 p.m. to 3:00 p.m., as well as every Tuesday from 9:00 a.m. to 11:00 a.m. or from 1:00 to 3:00 p.m.  (Id. at 4.)  Armstrong attaches copies of the "Ad-Seg Law Library Attendance Record" that she completed for the period from October 29, 2007, to January 8, 2008.  (Id. Ex. A, at 10-20.)

**1.   Differential treatment**

According to Defendant, there is no evidence that she treated the yard groups in a "substantially different" manner when scheduling law library access.  (Id. Attach. #1 Mem. P. & A. 20.) Nonetheless, Armstrong concedes that on six different occasions, she scheduled Bryant and the other inmates in yard group two for law library visits at times that conflicted with their assigned yard times.  (See id. at 20-21.)

13

08cv02318 W(RBB)

The law library and recreation yard schedules, attached as exhibits to the cross motions, are for a finite period; yet, they reveal differential treatment.  Yard groups one, two, three, and four had yard times on Mondays, Wednesdays, and Saturdays.  (Id. Attach. #7 Decl. Lizarraga 3.)  Because the library was only available on Mondays and Tuesdays, their yard and library times could conflict on Mondays.  (Id. Attach. #2 Decl. Armstrong 4.)  Yard groups five, six, seven, and eight had yard times on Tuesdays, Fridays, and Sundays, so their scheduled yard and library times could conflict on Tuesdays.  (Id. Attach. #7 Decl. Lizarraga 3.)

Armstrong scheduled Bryant and other prisoners in yard group two for morning or afternoon law library access that conflicted with their Monday yard time on six of the twenty-two library sessions reflected in the available attendance records.  (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 10-11, 13-14, 18, 20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 16, 18, 22, 24, 32, 35.)

The inmates assigned to other yard groups did not have many conflicts.  Yard group one prisoners had no conflicts out of the eight law library sessions that Armstrong assigned them.  (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 10-11, 13-15, 17, 20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 18, 24, 26, 30, 35.)  Defendant scheduled inmates in yard group three to go to the library seven times without any conflicts with their Monday yard access.  (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 11, 13-17, 20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 18, 24, 26, 30, 35.)  Yard group four had no law library sessions during this period.  (See generally id. Attach. #2 Decl. Armstrong Ex. A, at 10-20; id. Attach. #7 Decl. Lizarraga Ex. A, at 16-36.)

14

Armstrong scheduled group five inmates for nine library sessions, and none of them conflicted with their assigned Tuesday yard access. (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 10-12, 14, 16, 20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 17, 19-20, 24, 28, 36.)[2]

The prisoners in yard group six were scheduled for nine law library sessions, and only one of them conflicted with a yard assignment. (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 10-11, 14, 15-18, 20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 17, 19, 22, 26, 30, 35-36.)  Out of the nineteen library sessions that Armstrong assigned to group seven prisoners, only two sessions conflicted with the inmates' Tuesday yard access. (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 10-20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 19-20, 22, 24, 26, 28, 30, 36.)  Finally, yard group eight inmates had no conflicts for the eleven times they were scheduled to go to the law library. (Compare id. Attach. #2 Decl. Armstrong Ex. A, at 10-12, 14-20, with id. Attach. #7 Decl. Lizarraga Ex. A, at 20, 24, 36.)[3]

---

[2]  The Defendant states that yard groups five and seven both had one occasion when their library access conflicted with their yard time, but she provides no basis for this determination. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 21, ECF No. 91.) Armstrong draws conclusions from the record without explaining the bases for them, forcing the Court to comb through the scheduling records to ascertain the number of conflicts per yard group. "[T]his Court has discretion to refuse to consider evidence that the offering party fails to cite with sufficient specificity." Bd. of Trs. of the Sheet Metal Workers Health Care Plan v. Vigil, No. C08-181-JLR, 2011 U.S. Dist. LEXIS 28171, at *2 (N.D. Cal. Mar. 18, 2011) (citing Orr v. Bank of America, NT & SA, 285 F.3d 764, 775 (9th Cir. 2002)).  Nonetheless, from the Court's review, Armstrong's calculations and records do not match.

[3]  These numbers only reflect part of the period in question. Yard recreation records for December 3, 4, 10, 11, 17, 18, and 31, 2007, are illegible or unclear. (See Defs.' Mot. Summ. J. Attach. #7 Decl. Lizarraga Ex. A, at 26, 28, 30, 32-34, ECF No. 91.)

Thus, Bryant and the other yard group two inmates were scheduled for the law library at times that conflicted with their yard access on six occasions out of the twenty-two library sessions, or 27.27% of the time. (See generally id. Attach. #2 Decl. Armstrong Ex. A, at 10-20; id. Attach. #7 Decl. Lizarraga Ex. A, at 16-36.) The inmates in yard groups one, three, five, seven, and eight had no conflicts. (See id.) Yard group seven prisoners had two conflicts out of nineteen library sessions, which is 10.52% of the time. (See id.) Yard group six inmates had one conflict out of nine sessions, or 11.11% of the time. (See id.)

The evidence demonstrates that Armstrong treated Bryant and the inmates in yard group two differently from other yard groups. Their conflicts were nearly triple that of any other yard group for the eleven-week period from October 29, 2007, to January 8, 2008. The inquiry is therefore whether the differential treatment rises to the level of an equal protection violation.

**2. Whether a suspect class is implicated**

Armstrong asserts that Bryant's claim that he and the other yard group two inmates were treated differently because of their race fails because no suspect class is implicated. (See id. Attach. #1 Mem. P. & A. 21.) The Defendant maintains that she scheduled law library times based on the inmates' yard group assignments, which are determined by gang affiliations, not race. (Id. at 20; see id. Attach. #3 Decl. Janda 3-4.) A yard group assignment is not a suspect class. (Id. Attach. #1 Mem. P. & A.

---

Lizarraga maintains that the Monday yard schedule for yard group two inmates rotated each week in the morning and afternoon, but Bryant represents that yard two had several conflicts on these days as well. (Pl.'s Mot. Summ. J. Decl. Bryant 30, ECF No. 92; see Defs.' Mot. Summ. J. Attach. #7 Decl. Lizarraga 3, ECF No. 91.)

08cv02318 W(RBB)

21.)  Armstrong concedes that yard groups two and five contained
mostly Black prisoners; she points out that several other yard
groups contained mostly Hispanic prisoners but were not treated the
same as the Hispanic inmates in yard group one.  (Id.)  "[T]he fact
that there were Black inmates in other yard groups provides further
proof that any difference in treatment for Yard Group No. 2 was not
race-based."  (Id. at 20.)

       Bryant states that the inmates in yard group one were
Hispanic, and "there was never another race of inmates other than
African-Americans" in yard group two.  (Pl.'s Mot. Summ. J. Decl.
Bryant 34, ECF No. 92.)  Other than racial distinctions, yard
groups one and two were similarly situated and had the same yard
times, every Monday, Wednesday, and Saturday.  (Id. at 22.)  The
Hispanic prisoners in yard one enjoyed four hours outside their
cells every Monday – two hours at the law library and two hours on
the recreation yard.  (Id. at 24.)  Bryant and the other
African-American prisoners in yard two, however, only received two
hours outside their cells every Monday because they had to choose
between outdoor exercise and access to the law library.  (Id.)
Bryant attaches the "Administrative Segregation Daily Yard
Activity" form for the one-week period of January 25, to January
31, 2008.  (Id. at 22-23; see id. Attach. #1 Ex. 1, at 2-3.)  The
form indicates that yard group two was "controlled compatible
Black/Northern Hispanic/Other," and the ethnicity of each inmate
was "Black."  (Pl.'s Mot. Summ. J. Decl. Bryant 23, ECF No. 92; see
id. Attach. #1 Ex. 1, at 2-3.)

       Armstrong contends that yard group assignments were based on
gang affiliations, but she did not serve on the classification

committee that made the assignments.  (<u>See</u> Defs.' Mot. Summ. J.
Attach. #2 Decl. Armstrong 2-3, ECF No. 91.)  Defendant Janda, then
associate warden, states that the policy was to place inmates in
yard groups that were "controlled-compatible."  (<u>Id.</u> Attach. #3
Decl. Janda 3.)  Janda served on the committee that placed Bryant
in yard group two, which was deemed "controlled-compatible for
Crips (primarily Black inmates), Northern Hispanic gang members,
and other compatible inmates."  (<u>Id.</u> at 4.)  For yard group one,
Janda states, "I believe [yard group one inmates] were Southern
Hispanic gang members, and both affiliated and non-affiliated White
inmates who were deemed compatible."  (<u>Id.</u>)

There is no document or record showing the gang breakdown by
yard.  Defendant Janda's sworn statement that yard group two was
deemed compatible for Crips gang members conflicts with the annual
review form he signed on April 24, 2008, which does not discuss
gang affiliation; instead, Janda classified yard group two as
compatible for "Blacks, Northern Hispanics, Others."  (<u>See</u> Pl.'s
Opp'n Defs.' Mot. Summ. J. Attach. #2 Ex. 25, at 112, ECF No. 101.)
Janda's current statement that yard group two was Crips compatible
also conflicts with Bryant's sworn statement and the ASU yard
activity form indicating that the inmates were "Black."  (<u>See</u> Pl.'s
Mot. Summ. J. Decl. Bryant 34, ECF No. 92; <u>id.</u> Attach. #1, Ex. 1,
at 2-3.)

"Credibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury
functions, not those of a judge, whether he is ruling on a motion
for summary judgment or for a directed verdict."  <u>Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. at 255.   There is a material issue of fact as to whether the equal protection claim implicates a suspect class.

### 3.   Class-wide violation

When asserting a class-wide violation based on membership in a protected class, a plaintiff must establish that the defendant acted with intent to discriminate based on plaintiff's membership in that class.   <u>Barren</u>, 152 F.3d at 1194.   In cases alleging racial discrimination, for example, "'proof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause."   <u>City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.</u>, 538 U.S. 188, 194 (2003) (quoting <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. at 265). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.   It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."   <u>Personnel Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979) (footnote omitted) (citation omitted); <u>accord</u> <u>Navarro v. Bock</u>, 72 F.3d 712, 716 n.5 (9th Cir. 1995).

If the yard groups were racially determined, Armstrong's continued reliance on yard assignments to create the library schedule may show that she acted with a discriminatory intent.   As discussed, to make an equal protection claim that Armstrong discriminated on the basis of Bryant's race, Plaintiff must show that the Defendant acted with a discriminatory intent when scheduling law library visits.   <u>See</u> <u>City of Cuyahoga Falls</u>, 538 U.S. at 194.

Defendant argues that the attendance records show that yard group five also contained African-American inmates and was treated the same as yard group seven, which included mostly Hispanic prisoners. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 20-21, ECF No. 91.) In his Declaration, then-Chief Deputy Warden Ochoa states that there was nothing inherently wrong with scheduling inmates for library access at times that conflicted with their yard access. (See id. Attach. #6 Decl. Ochoa 4.) Further, the more law library time an inmate sought, the greater the potential for a conflict with yard time. (Id. Attach. #1 Mem. P. & A. 20.) When making the schedules, Armstrong considered legal deadlines, last minute attendance requests, limited space availability, gang affiliations, outdoor exercise yard time, and library request cancellations. (Id. at 22.)

Plaintiff argues that despite their same yard schedules, Armstrong intentionally treated Bryant and the other inmates in yard group two differently from inmates in group one by scheduling them for the library at times that conflicted with their yard times. (Pl.'s Mot. Summ. J. Decl. Bryant 23, ECF No. 92.) Defendant "made it known" that she was affiliated with the "Southern California Hispanic gangs," and she repeatedly referred to those inmates as her "Homies." (Pl.'s Mot. Summ. J. 13.) When Plaintiff went to the law library with Hispanic inmates assigned to other yards, he heard Armstrong "whispering personal matters" to those inmates about her two children who were half Hispanic. (Id. Bryant Decl. 24.) Despite her concern for inmate conflict, Bryant notes that Armstrong consistently scheduled yard group two prisoners with prisoners from every other yard group. (Pl.'s Opp'n

Defs.' Mot. Summ. J. 18, ECF No. 101.)  When Bryant and other yard

two inmates spoke to Armstrong about her scheduling, she told

Plaintiff, "You don't have to go to the law library!"  (Pl.'s Mot.

Summ. J. Decl. Bryant 23, ECF No. 92.)

As evidence, Bryant attaches copies of the same law library

attendance records from October 29, 2007, to January 8, 2008, that

Defendant Armstrong provided.  (<u>Id.</u> Decl. Bryant 24; <u>id.</u> Attach. #1

Ex. 4, at 10-20.)  Bryant includes the declaration of inmate Ricky

Smith who also heard Armstrong refer to Southern California Latino

gang members as her "Homies." (<u>Id.</u> Attach. #1 Ex. 5, at 22.)

Plaintiff relies on the declarations of inmates Donnell Atlas and

Cleveland Dale, who submit that Armstrong gave them an ultimatum to

choose between the law library or recreation time.  (Pl.'s Mot.

Summ. J. Attach. #1 Ex. 2, at 5-6, ECF No. 92; <u>id.</u> Ex. 3, at 8.)

In one of Armstrong's interrogatory responses, she discloses

that she was arrested for her involvement in a drug conspiracy

involving the "Avenues gang." (Pl.'s Suppl. Decl. Opp'n Defs.'

Mot. Summ. J. 2, ECF No. 115; <u>id.</u> Ex. 37, at 8.)  Bryant argues

that being affiliated with a "Southern California Hispanic and/or

race-oriented gang" is evidence that Armstrong intended to racially

discriminate against Plaintiff when making the law library

schedule.  (Pl.'s Suppl. Decl. Opp'n Defs.' Mot. Summ. J. 2, ECF

No. 115.)  Reasonable minds, however, could differ as to whether

this proves Armstrong's discriminatory intent.  <u>Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. at 250-51 (stating that judgment should not be

entered in favor of the moving party if reasonable minds could

differ as to the import of the evidence); <u>see also</u> <u>id.</u> at 255

1  (noting that weighing evidence and drawing legitimate inferences

2  from the facts are jury functions).

3      The conflicting evidence precludes summary judgment for either

4  side on the class-wide equal protection claim.  See Nelson v. City

5  of Davis, 571 F.3d 924, 929 (9th Cir. 2009) (stating that when the

6  evidence conflicts, questions of credibility present an issue of

7  fact that is inappropriate for resolution on summary judgment).

8          a.    Class-of-one violation

9      An alternative basis for relief may be an equal protection

10  claim under a class-of-one theory.  See Engquist, 553 U.S. at 601;

11  Olech, 528 U.S. at 564.  Under this theory, Plaintiff must

12  establish that Armstrong intentionally treated him differently from

13  other similarly situated individuals without a rational basis for

14  the difference in treatment.  See id.

15      "A class of one plaintiff must show that the discriminatory

16  treatment 'was intentionally directed just at him, as opposed . . .

17  to being an accident or a random act.'"  North Pacifica LLC v. City

18  of Pacifica, 526 F.3d 478, 486 (9th Cir. 2008) (quoting Jackson v.

19  Burke, 256 F.3d 93, 96 (2d Cir. 2001)).  A class-of-one claim is

20  premised on the theory that Defendants "harbor animus against

21  [plaintiff] in particular and therefore treated [him] arbitrarily."

22  Papas v. Arcadia Enters., Inc., No. 3:10-CV-00550-BR, 2012 U.S.

23  Dist. LEXIS 58485, at *37 (D. Or. Apr. 25, 2012).  Bryant, however,

24  alleges that he and other African-American inmates assigned to yard

25  two were subjected to racial discrimination in violation of their

26  equal protection rights.  (See Second Am. Compl. 13-15, ECF No.

27  39.)

28

                                22                      08cv02318 W(RBB)

To the extent that Plaintiff's allegations give rise to a class-of-one equal protection claim, Defendant urges that any disparate treatment was based on several considerations that were rationally related to a legitimate purpose. (See Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 22, ECF No. 91.) Defendant represents that when scheduling inmates for the library, she had to balance several priorities. (Id. Attach. #2 Decl. Armstrong 4.)

Bryant was assigned law library sessions on twenty-two different occasions. (Id. Attach. #2 Decl. Armstrong Ex. A, at 10-20.) He was given priority law library access nineteen out of the twenty-two times due to verified court deadlines. (Id.; see also id. Attach. #2 Decl. Armstrong 4-5 (reflecting that Armstrong had to give priority law library access to inmates with court deadlines).) As previously discussed, the record reflects that Bryant had six out of twenty-two scheduling conflicts, or 27.27% of the time. (See generally id. Attach. #2 Decl. Armstrong Ex. A, at 10-20; id. Attach. #7 Decl. Lizarraga Ex. A, at 16-36.) Yard group seven prisoners had two conflicts out of nineteen conflicts, which is 10.52% of the time, and yard group six inmates had one conflict out of nine sessions, or 11.11% of the time. (Id.) Inmates in yard groups one, three, five, seven, and eight had no conflicts. (Id.)

Armstrong scheduled Bryant for library time that conflicted with yard time more frequently than she scheduled conflicting library and yard times for other inmates. The inquiry is whether the schedules could have been rationally related to a legitimate governmental interest. See Olech, 528 U.S. at 564. "[W]hen undertaking rational basis review, the party defending the

constitutionality of the [conduct] need not introduce evidence or prove the actual motivation behind [the conduct], but need only demonstrate that there is some legitimate justification that could have motivated the action." Adhi Parasakthi Charitable v. Twp. of W. Pikeland, 721 F. Supp. 2d 361, 381 (E.D. Pa. 2010) (emphasis added) (citing FCC v. Beach Commc'ns, 508 U.S. 307, 315 (1993)).

Armstrong identifies several considerations she had to take into account when making the library schedules. (Defs.' Mot. Summ. J. Attach. #2 Decl. Armstrong 4-5, ECF No. 91.) She submits that she had to give inmates with court deadlines priority, process inmates' library request slips, and fill canceled library spots. (Id. at 4-6.) The Defendant also considered inmates' yard group assignments because some yard groups could not go to the law library at the same time due to a potential for conflict. (Defs.' Mot. Summ. J. Attach. #2 Decl. Armstrong 5, ECF No. 91.)

Defendant also had to check inmates' ASU files for enemies and affiliations, but she does not reference any instance in which this concern led to Bryant's scheduling conflicts. (Id.) Moreover, the evidence reflects that Defendant repeatedly scheduled individuals from two to four different yard groups together at a time to attend the law library. (See generally id. Attach. #2 Decl. Armstrong Ex. A, at 10-20.)

Armstrong indicates she had to consider which yard groups were attending yard recreation on a particular day to avoid conflicts because the exercise yards were located "outside the rear exit of ASU 2," which is the same exit used to escort inmates to the van to be transported to the law library. (Id. Attach. #2 Decl. Armstrong 5.) Cellmates or inmates in the same yard group could be escorted

to the van in groups; otherwise, inmates were escorted separately
and the exercise yard was "shut down."  (Id. at 5-6.)  Because this
caused delays, Armstrong typically scheduled yard groups for law
library time when those groups were scheduled for yard time.  (Id.
at 6.)

Under the allegations in his Second Amended Complaint and in
light of the evidence submitted, Bryant cannot succeed on a class-
of-one equal protection claim.  First, he maintains that African-
American inmates in yard two are being discriminated against by
Armstrong on the basis of race, a class-wide theory.  Second, the
only animus offered by Plaintiff is that Defendant Armstrong
assigned Hispanics and Whites library and yard times that did not
conflict.

Defendant Armstrong's Motion for Summary Judgment on the
class-wide equal protection claim against her in count one should
be **DENIED**.  But to the extent Plaintiff is pursuing a class-of-one
equal protection claim against Armstrong, Defendant's Motion for
Summary Judgment should be **GRANTED**.  The Plaintiff's Motion for
Summary Judgment on count one should also be **DENIED**.

**B.    Count Two:  Retaliation (Armstrong)**

Inmates have a First Amendment right to meaningful access to
the courts, which includes the right to invoke established prison
grievance procedures.  Trueman v. State, No. CV 09-2179-PHX-
RCB(DKD), 2010 U.S. Dist. LEXIS 67847, at *12 (D. Ariz. June 15,
2010) (citing Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995)).
Government officials may not retaliate against prisoners who
exercise their First Amendment rights.  Vignolo v. Miller, 120 F.3d
1075, 1077-78 (9th Cir. 1997); see also Soranno's Gasco, Inc. v.

<u>Morgan</u>, 874 F.2d 1310, 1314 (9th Cir. 1989) (suspending permits because of Soranno's public criticism of defendants).

Because retaliation by prison officials may chill a prisoner's exercise of legitimate First Amendment rights, retaliatory conduct is actionable even if it would not otherwise rise to the level of a constitutional violation. <u>Thomas v. Evans</u>, 880 F.2d 1235, 1242 (11th Cir. 1989) (citations omitted). Nonetheless, courts review these claims with particular care because they are prone to abuse by prisoners. <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996).

Defendant Armstrong argues that she is entitled to summary judgment on the retaliation claim in count two. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 22, ECF No. 91.) She states that she did not issue the allegedly retaliatory informational chrono against Bryant on January 28, 2008, because of his advice to another inmate about filing grievances; rather, she issued it because of multiple instances of misconduct by Plaintiff between January 8 and 28, 2008. (<u>Id.</u> Attach. #2 Decl. Armstrong, at 7-8.) The Defendant warned Plaintiff about several inappropriate comments he made to her before she ultimately issued the chrono on January 28th. (<u>Id.</u> at 7.)

Bryant contends that Armstrong "knew of the protected speech." (Pl.'s Mot. Summ. J. 15, ECF No. 92.) In the chrono she wrote on Bryant, Armstrong refers to statements he made about a grievance that was submitted by another inmate, Teklezgi Gebrezgiabher, on January 28, 2008. (<u>Id.</u>) Plaintiff believes the timing is suspect, as Defendant later conceded in an interrogatory response that the chrono was actually submitted on January 28, instead of January 8, 2008. (<u>Id.</u>) Armstrong also accused Plaintiff of "dropp[ing] a

kite," or snitching, and then taped the written complaint to her
desk and displayed it for other prisoners to see.  (Id.; see id.
Decl. Gebrezgiabher 24-25.)

A plaintiff suing prison officials under § 1983 for
retaliation must establish (1) that "the retaliated-against conduct
is protected," (2) the "defendant took adverse action against
plaintiff," (3) the existence of a "causal connection between the
adverse action and the protected conduct," (4) the act "would chill
or silence a person of ordinary firmness," and (5) that the conduct
does not further a legitimate penological interest.  Watison v.
Carter, 668 F.3d 1108, 1114 (9th Cir. 2012).  A plaintiff can
allege retaliatory intent by showing a time line of events from
which retaliation can be inferred.  See id. (citations omitted).

The informational chrono issued by Armstrong is dated
"Tuesday, January 8, 2008," but references events that occurred on
January 8, 22, 25, and 28, 2008.  (Pl.'s Mot. Summ. J. Attach. #1
Ex. 8, at 38, ECF No. 92 (emphasis added).)  Armstrong states in
her declaration and response to an interrogatory that the January
8, 2008 date on the chrono is a typographical error.  (Defs.' Mot.
Summ. J. Attach. #2 Decl. Armstrong 7, ECF No. 91; Pl.'s Mot. Summ.
J. Ex. 9, at 42, ECF No. 92 ("To the best of my recollection, the
date of the chrono should be January 28, 2008, which is the date of
the last incident mentioned in the chrono.").)  This, however, was
not a Tuesday.

Bryant submitted a grievance against Armstrong on January 29,
2008, alleging discriminatory law library scheduling.  (Defs.' Mot.
Summ. J. Attach. #3 Decl. Janda Ex. C, at 6, ECF No. 91.)
According to Plaintiff, he did not receive the informational chrono

until February 7, 2008, which was after his grievance against

Armstrong. (Pl.'s Mot. Summ. J. Decl. Bryant 25, ECF No. 92.)

Plaintiff submitted another grievance against Armstrong on February

19, 2008, for the false informational chrono she previously

submitted against Bryant. (Defs.' Mot. Summ. J. Attach. #3 Decl.

Janda Ex. D, at 17, ECF No. 91.)

There is a genuine issue of fact as to the nature of the

retaliated-against conduct and whether it was protected. Bryant

maintains that he was "advising Gebrezgiabher on how to secure his

CDC 602 grievance, [and] Defendant Armstrong became irate . . . ."

(Pl.'s Mot. Summ. J. Decl. Bryant 25, ECF No. 92.) Armstrong

counters that "Bryant insinuated to another inmate that I would

commit misconduct by misplacing an inmate appeal that was handed to

me." (Defs.' Mot. Summ J. Attach. #2 Decl. Armstrong 7, ECF No.

91.) Assisting another inmate with the prison grievance procedure

is protected by the First Amendment. Rizzo v. Dawson, 778 F.2d

527, 531-32 (9th Cir. 1985); accord Wiideman v. Smith, No. 3:10-cv-

0329-LRH-RAM, 2010 U.S. Dist. LEXIS 96712, at *5 (D. Nev. Aug. 26,

2010); Lewis v. Tilton, No. 1:07-cv-519-OWW-DLB (PC), 2008 U.S.

Dist. LEXIS 11325, at *24 (E.D. Cal. Jan. 30, 2008). But see Adams

v. James, 784 F.2d 1077, 1082 (11th Cir. 1987); McCalvin v.

Fairman, 603 F. Supp. 342, 347 (C.D. Ill. 1985).

If Armstrong submitted the chrono on January 28, 2008, as she

believes, the purportedly retaliatory chrono was written after

Bryant advised inmate Gebrezgiabher but before Bryant filed the

grievance against Armstrong on January 29, 2008. Yet, if the

chrono was actually submitted after January 28, 2008, it could have

been issued in retaliation for giving legal advice to another

inmate or for the grievance Bryant submitted against Armstrong on January 29, 2008.  See id.  Under either scenario, Bryant would have been exercising his First Amendment rights.

Plaintiff must demonstrate that Armstrong took "adverse action" against him.  Watison, 668 F.3d at 1114.  But the adverse action need not rise to the level of a separate constitutional violation.  See Pratt v. Rowland, 65 F.3d 802, 804, 806 (9th Cir. 1995) (claiming "transfer and subsequent double-celling were done in retaliation for [plaintiff's] exercise of First Amendment rights[]").  More recently, the Ninth Circuit has stated that "the mere threat of harm can be an adverse action . . . ."  Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009).  "[T]he record before the district court was sufficient to establish a genuine issue of material fact as to whether [the corrections officer's] warning constituted an adverse action."  Id.

Here, Bryant asserts that Armstrong wrote a "false and retaliatory '128-B Information Chrono'" accusing him of making inappropriate comments to her.  (Pl.'s Mot. Summ. J. Decl. Bryant 25-26, ECF No. 92.)  The chrono was written after Bryant assisted inmate Gebrezgiabher with his grievance against Armstrong and after Bryant complained to Sergeant Ellis that Armstrong had accused Plaintiff of "'dropping a kite' (Snitching)" on her.  (Id. at 25.) The evidence is sufficient to establish the second element of a retaliation claim, taking adverse action against the Plaintiff. See Watison, 668 F.3d at 1114.

The remaining elements of Bryant's claim against Armstrong cannot be resolved on these cross motions.  For example, according to Defendant Armstrong, on January 28, 2008, "Bryant insinuated to

another inmate that I would commit misconduct by misplacing an inmate appeal that was handed to me.  It was obvious that my verbal warnings did not work, so I wrote an Information Chrono . . . ." (Defs.' Mot. Summ. J. Attach. #2 Decl. Armstrong 7, ECF No. 91.) She wrote the chrono "based on the accumulation of events and totality of the circumstances."  (Id.)  There are genuine issues of fact as to whether (a) Bryant's protected conduct was the basis for Armstrong's adverse action; (b) the Defendant's acts would chill a person of ordinary firmness from future First Amendment activity; and (c) Armstrong's action advanced legitimate goals of the prison system.  See id.

     The jury is in the best position to weigh the credibility of Plaintiff and Defendant, identify the constitutionally protected conduct Bryant engaged in, and determine whether Armstrong filed the chrono in retaliation for Plaintiff's protected conduct.  See Nelson, 571 F.3d at 929.  The remaining factors required for a retaliation claim depend on a determination of the facts. Accordingly, Armstrong's Motion for Summary Judgment on the retaliation claim against her in count two should be **DENIED**. Plaintiff's Motion for Summary Judgment on this claim should also be **DENIED**.

**C.   Count Three:  Equal Protection and Retaliation (Lizarraga, Trujillo, Catlett, Janda, and Ochoa)**

     **1.   Equal protection**

     As discussed previously, a plaintiff can establish an equal protection cause of action by showing that the defendant intentionally discriminated on the basis of plaintiff's membership in a protected class, such as race.  Barren, 152 F.3d at 1194-95;

<u>Damiano</u>, 785 F.2d at 932-33.  Or, if the state action does not

implicate a fundamental right or a suspect classification, a

plaintiff can establish an equal protection claim by demonstrating

that the defendant intentionally treated plaintiff differently from

other similarly situated individuals without a rational basis.

<u>Engquist</u>, 553 U.S. at 601; <u>Olech</u>, 528 U.S. at 564.

### a.  Lizarraga

Defendant Lizarraga moves for summary judgment on the equal

protection claim in count three that he discriminated against

African-American inmates by moving them from ASU #2 to ASU #1,

which was a more restrictive placement.  (Defs.' Mot. Summ. J.

Attach. #1 Mem. P. & A. 24, ECF No. 91.)  The Defendant served as a

"Floor Officer" in ASU #2 during the time in question.  (<u>Id.</u>

Attach. #7 Decl. Lizarraga 1.)  He sometimes "physically escorted"

inmates that were being transferred from one unit to another.  (<u>Id.</u>

at 4.)

First, Lizarraga submits that there is no evidence that

African-American inmates were treated differently from other

inmates being transferred from ASU #2 to ASU #1.  (<u>Id.</u> Attach. #1

Mem. P. & A. 24.)  Second, prisoners were not transferred for

punishment or retaliation; rather, when a cell became available in

ASU #1, an inmate from ASU #2, who was compatible with the inmate

in an available cell, was moved.  (<u>Id.</u>)  Third, staff in ASU #1

contacted staff in ASU #2 to request an inmate transfer.  (<u>Id.</u> at

24-25.)  Fourth, Lizarraga asserts that as a floor officer, he did

not order or approve Bryant's transfer and lacked the authority to

do so.  (<u>Id.</u> at 25.)

Bryant argues that after he and inmate Gebrezgiabher filed grievances against Armstrong for racial discrimination, Lizarraga retaliated by targeting African-American inmates assigned to ASU #2, yard group two, and transferring them to ASU #1 until only three yard group two inmates remained in ASU #2. (Pl.'s Mot. Summ. J. 13, ECF No. 92.) "Defendants cannot dispute that there was never another race of inmates assigned to Group yard No. 2 other than African-Americans." (Id. at 14.) Also, Lizarraga knew that yard two was comprised solely of African-American inmates when he initiated his racially-motivated cell moves. (Pl.'s Opp'n Defs.' Mot. Summ. J. 18, ECF No. 101.)

In his Declaration, the Defendant explains that the primary administrative segregation unit at Calipatria is ASU #1, but in 2007-2008, officials used ASU #2 as an overflow segregation unit. (Def.'s Mot. Summ. J. Attach. #7 Decl. Lizarraga 2, ECF No. 91.) ASU #1 was kept at full capacity, and as space became available, prisoners were transferred from ASU #2 to ASU #1. (Id.) Inmates preferred to be housed in ASU #2. (Id.) Lizarraga represents that he did not have authority to transfer inmates from ASU #2 to ASU #1, or determine which inmates would be transferred, though he often escorted inmates during a transfer. (Id. at 4.) The request by staff in ASU #1 for a transfer had to be approved by a correctional sergeant or a higher-ranking official, because the transferring inmate had to be compatible with the inmate in the available cell. (Id.) Defendant states that on July 7, 2008, he was informed that Bryant was being transferred from ASU #2 to ASU #1; Lizarraga did not order or approve the transfer and did not choose Bryant for the move. (Id.)

1   Transportation Sergeant Catlett, Lizarraga's direct
2  supervisor, acknowledges that he recommended that Bryant be
3  considered for transfer and that Lizarraga lacked the authority to
4  order that inmates be transferred.  (Id. Attach. #5 Decl. Catlett
5  1, 3-5; id. Ex. H, at 9.)  Bryant's inmate transfer form was
6  completed by Sergeant Catlett and approved by Watch Commander J.L.
7  Prado; the form indicates that only a "Correctional Lieutenant or
8  above" could approve the transfer.  (Id. Ex. H, at 9.)

9   Plaintiff points to some evidence contradicting Lizarraga's
10 statements that, as a floor officer, he lacked authority to
11 transfer inmates or select which inmates would be transferred to
12 ASU #1 when space was available.  Celotex, 477 U.S. at 324 (noting
13 that to withstand a motion for summary judgment, an opposition must
14 set forth specific facts by producing competent evidence that shows
15 a genuine issue for trial); Taylor, 880 F.2d at 1045 (opposing
16 party cannot rely on allegations that are not supported by factual
17 data).

18   Bryant submits that in a conversation between inmate Tyun
19 Dodson and Lizarraga, the Defendant stated, "'I'm gonna send Bryant
20 to ASU.'"  (Pl.'s Mot. Summ. J. Attach. #2 Ex. 20, at 47, 49, ECF
21 No. 92 (Dodson Declaration).)  Similarly, Lizarraga told inmate
22 Stevenson, "'Bryant wrote me a 602 (grievance) against me
23 [Lizarraga], so I moved his ass back to ASU, and you're next . . .
24 .'"  (Id. Ex. 21, at 52 (Stevenson Declaration).)  The two third-
25 party declarations raise a genuine dispute concerning Lizarraga's
26 authority to transfer inmates.

27   "Liability under section 1983 arises only upon a showing of
28 personal participation by the defendant."  Taylor, 880 F.2d at

1045.  State officials are subject to suit in their personal capacity if "they play an affirmative part in the alleged deprivation of constitutional rights."  <u>King v. Atiyeh</u>, 814 F.2d 565, 568 (9th Cir. 1987).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  <u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988).

Bryant has produced evidence sufficient to rebut Lizarraga's assertion that he had no authority to transfer Bryant to ASU #2. There is a genuine issue of fact.  For these reasons, Lizarraga's Motion for Summary Judgment on the equal protection claim in count three should be **DENIED**, and the Plaintiff's Motion for Summary Judgment should **DENIED**.

   **b.   Trujillo**

Bryant argues that on August 15, 2008, Trujillo, the senior hearing officer, conducted Bryant's disciplinary hearing for the rules violation reported by Lizarraga, Plaintiff's refusal to double cell.  (Pl.'s Mot. Summ. J. Decl. Bryant 40, ECF No. 92.) Trujillo racially discriminated against Plaintiff by denying his requests to present defense witnesses to testify during the hearing.  (<u>Id.</u> at 40-41.)  The Defendant also wrote a false report and misrepresented that Plaintiff had chosen not to call any witnesses at the hearing.  (<u>Id.</u>)  At the conclusion of the hearing, Trujillo "displayed racial discriminatory animus" toward Bryant by calling three Hispanic officers into the office, who surrounded Bryant in a "menacing manner."  (<u>Id.</u> at 42.)  Plaintiff contends that Trujillo then said to him, "We [the Hispanic staff] are gonna

continue to write you up.  You are going to obey us whether you like our race or not, or we are gonna make sure you don't ever get out of the hole!"  (Id.)

Defendant Trujillo does not address the equal protection claim against him in count three.  (See generally Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 26, ECF No. 91 (arguing for summary judgment only on the retaliation allegation against him in count three).)

Plaintiff claims that Trujillo's misrepresentation of the record and his threatening statements are evidence that his decision to deny Plaintiff's request to call witnesses at the disciplinary hearing was racially motivated.  (Pl.'s Mot. Summ. J. 14, ECF No. 92.)  To establish an equal protection violation based on a protected class, Plaintiff must introduce evidence that Trujillo acted with discriminatory intent.  See City of Cuyahoga Falls, 538 U.S. at 194.

Bryant relies on Trujillo's response to interrogatory number four asking him to state all reasons why, on August 15, 2008, he "denied Plaintiff's request to have the inmates listed as Plaintiff's witnesses on the CDC 115-A form" attend the disciplinary hearing.  (Pl.'s Mot. Summ. J. Attach. #2 Ex. 29, at 108, ECF No. 92.)  The form lists inmates Booker and Dodson.  (Id. Attach. #2 Ex. 25, at 78.)  Trujillo responded to the interrogatory as follows:

> Because Plaintiff was in the Administrative Segregation Unit, he was assigned an Investigative Employee to assist him in investigating the charges and interviewing witnesses.  The Investigative Employee interviewed both inmate witnesses prior to the disciplinary hearing, and documented the interviews in the Investigative Employee Report.  Prior to the hearing, I reviewed the Investigative Employee Report with the

witness statements.   Therefore, there was no need to
bring the inmates to the hearing.

(Id. Ex. 29, at 108-09.)   In the violation report he signed on
September 12, 2008, Lieutenant Trujillo wrote, "Inmate BRYANT chose
not to have witnesses at the hearing."   (Id. Attach. #2 Ex. 25, at
75.)

Trujillo's interrogatory response does not dispute that Bryant
asked to call inmates Booker and Dodson at the hearing, and that
Trujillo ignored this request.   Apparently, he no longer maintains
that Bryant chose not to have witnesses at the hearing.   Instead,
Trujillo states that Bryant was not prejudiced because Trujillo
reviewed the inmate witness' statements before the hearing.   (See
id. Ex. 29, at 108-09.)   The Defendant also disputes that he
threatened Plaintiff, called three Hispanic officers into the rules
violation hearing to threaten Bryant, or made any racially-
motivated threats.   (Defs.' Mot. Summ. J. Attach. #4 Decl. Trujillo
3, ECF No. 91.)

It is unclear whether Trujillo maintains that Bryant chose not
to call witnesses at the disciplinary hearings.   The Defendant's
equivocal response to Plaintiff's interrogatory is circumstantial
evidence of Trujillo's intent to discriminate.   Whether Trujillo
and other Hispanic officers threatened Plaintiff because of his
race is disputed and is for the jury to resolve.   Credibility
determinations, weighing of the evidence, and drawing of legitimate
inferences all preclude summary judgment.   Liberty Lobby, Inc., 477
U.S. at 255.

Plaintiff's Motion for Summary Judgment against Trujillo on
the equal protection cause of action in count three should be
**DENIED**.

**2.   Retaliation**

Bryant moves for summary judgment against Defendants Lizarraga, Trujillo, Catlett, and Janda on the retaliation claim in count three.  (Pl.'s Mot. Summ. J. 14-20, ECF No. 92.)  All six Defendants move for summary judgment on the same claim.  (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 24-28, ECF No. 91.)

**a.   Armstrong**

Defendant Armstrong argues that she is entitled to summary judgment on the claim that she retaliated against Bryant by transferring him to ASU #1.  (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 26, ECF No. 91.)  Defendant states that she is alleged to have had "private conversations" with Lizarraga, but she lacked the authority to order or approve cell moves.  (Id.)  Armstrong contends that there is "no evidence" that she was involved in Plaintiff's cell transfer.  (Id.)  Essentially, Defendant argues that she had no authority to transfer Bryant, the adverse action alleged in count three.  The Plaintiff does not address this argument in either his Motion for Summary Judgment or in his Opposition to Defendants' Motion for Summary Judgment.

In the Second Amended Complaint, Bryant does not assert that Armstrong retaliated against him by transferring Bryant to ASU #1. If anything, his claim is that after Armstrong's tenure as legal officer ended, she was seen in ASU #2 "having private conversations" with Lizarraga before he initiated his campaign of racially-motivated cell transfers.  (Second Am. Compl. 26, ECF No. 39).  The Plaintiff has not asserted an independent retaliation claim against Defendant Armstrong for transferring him to ASU #1.

Defendant Armstrong's Motion for Summary Judgment based on a retaliation claim in count three should be **GRANTED**.

### b.   Lizarraga

Defendant Lizarraga also moves for summary judgment on the claim that he retaliated against Bryant for filing grievances by transferring Plaintiff to ASU #1 and issuing a false rules violation report. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 20, ECF No. 91.)  First, Defendant asserts he could not have retaliated by transferring Bryant to ASU #1 because he lacked the authority to do so. (<u>Id.</u> Attach. #7 Decl. Lizarraga 4.)  Second, Lizarraga did not retaliate by issuing the rules violation because the violation was for Plaintiff's refusal to follow a direct order to accept a cellmate, which Bryant admits. (<u>Id.</u> Attach. #1 Mem. P. & A. 25; <u>id.</u> Attach. #7 Decl. Lizarraga 3-4.)

Bryant argues that on May 28, 2008, he submitted a grievance against Lizarraga for racially motivated and retaliatory cell transfers; after the submission, the Defendant came to Bryant's cell threatening to move him back to ASU #1. (Pl.'s Mot. Summ. J. 16, ECF No. 92; <u>see id.</u> Decl. Bryant 31.)  Inmates Dodson and Stevenson, in their declarations, state that Lizarraga separately told each that he transferred, or was going to transfer, Bryant to ASU. (<u>Id.</u> Attach. #2 Ex. 20, at 49; <u>id.</u> Ex. 21, at 52.)

Bryant asserts that on July 2, 2008, Lizarraga announced, "Yard #2 i[s] on the yard, so I am going to move some of them to ASU." (<u>Id.</u> Decl. Bryant 31.)  Defendant also threatened to write up Plaintiff if he refused to live with a cellmate. (<u>Id.</u>)  On July 7, 2008, while Bryant was at the law library, he was moved to ASU #1; Plaintiff claims that Lizarraga disposed of some of Bryant's

legal documents.  (Id. at 37; Pl.'s Opp'n Defs.' Mot. Summ. J. 23, ECF No. 101.)  Plaintiff disputes that Lizarraga escorted him to a holding cell in ASU #2 before the move.  (Pl.'s Opp'n Defs.' Mot. Summ. J. 23, ECF No. 101 (asserting that Lizarraga's statement is contradicted in the declaration of inmate Rodney Jones).)  Bryant's claim that Lizarraga retaliated against him by transferring Plaintiff to ASU #1 cannot be decided at this stage because there is a genuine dispute over whether the Defendant transferred the Plaintiff to ASU #1.

Bryant argues that on July 17, 2008, he was served with a false and retaliatory disciplinary report written by Lizarraga indicating that Bryant had "refused a direct order to double cell." (Pl.'s Mot. Summ. J. 16, ECF No. 92.)  The Defendant did not follow double-celling procedure, which Plaintiff urges is further evidence of retaliation.  (Id. at 17; see id. Decl. Bryant 33.)  The timing of Lizarraga's disciplinary report suggests a retaliatory motive because it was filed on July 8, 2008, less than thirty days after Plaintiff's resubmitted grievance against Lizarraga was logged. (Id. Decl. Bryant 37.)

Bryant submitted his grievance against Lizarraga on May 28, 2008.  (Id. Attach. #1 Ex. 14, at 72.)  Plaintiff resubmitted it on June 5, 2008, and it was ultimately "logged" on June 9, 2008.  (Id. Decl. Bryant 37; see also id. Attach. #1 Ex. 14, at 72, 75.)  On July 2, 2008, the Defendant notified Bryant that because he had been temporarily single-celled, a compatible cellmate would be assigned to Bryant's cell.  (Defs.' Mot. Summ. J. Attach. #7 Decl. Lizarraga 3, ECF No. 91.)  Bryant contends that Defendant threatened to write him up unless he agreed to cell with inmate

Booker.  (Pl.'s Mot. Summ. J. Decl. Bryant 31, ECF No. 92.)  When

Plaintiff refused Lizarraga's direct order to accept a cellmate,

Defendant issued a rules violation report.  (Defs.' Mot. Summ. J.

Attach. #7 Decl. Lizarraga 3, ECF No. 91.)

In his July 8, 2008 rules violation report, Lizarraga states

the following:

> On Wednesday, July 2, 2008, . . . I instructed
> Inmate BRYANT . . . to prepare to receive a cell mate to
> accommodate institutional needs.  I informed BRYANT he
> was double cell cleared and needed to [] a cell mate, and
> a refusal too [sic] double cell would result in the
> issuance of a CDCR 115 rules violation report.  Inmate
> BRYANT stated 'well then, you have your answer[.]'  I
> ask[ed] BRYANT if that meant he was refusing to double
> cell.  Inmate BRYANT stated 'do what you gotta do[] I
> ain't doubling up'.  I informed BRYANT that I intended on
> housing Inmate BOOKER . . . who is assigned to the same
> yard group as himself an[d] who is currently housed
> singly with him.  BRYANT stated 'you got my answer, and
> when you write me up just don't lie I hate Liars.'

(Id. Attach. #4 Decl. Trujillo Ex. F, at 5.)  The Plaintiff was

ultimately found guilty of refusing a direct order to double cell.

(Id. at 8.)

There is no issue of fact as to whether Bryant's conduct was

protected.  He was exercising his First Amendment right to file

inmate grievances and discuss the grievance procedure with other

inmates.  See Watison, 668 F.3d at 1114.  Similarly, Lizarraga took

adverse action by issuing a rules violation against Bryant on July

8, 2008.  (Defs.' Mot. Summ. J. Attach. #7 Decl. Lizarraga 3, ECF

No. 91; see id. Attach. #4 Decl. Trujillo Ex. F, at 5.)  Because

whether the Defendant transferred Bryant is disputed, neither party

is entitled to summary judgment on this aspect of Plaintiff's

retaliation claim.

There is a material issue of fact as to whether the Defendant

transferred Bryant and, if so, whether he transferred Plaintiff and

issued the rules violation to retaliate for protected First
Amendment activity.  There is insufficient evidence to warrant
summary judgment for either party because the responsibility for
the transfer to ASU #1 and the causal connection are disputed.
Defendant Lizarraga's Motion for Summary Judgment should be **DENIED**.
The Plaintiff's Motion for Summary Judgment should also be **DENIED**.

### c.   Trujillo

Defendant Trujillo argues that there is no evidence that he
retaliated by conducting Bryant's disciplinary hearing unfairly.
(Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 26, ECF No. 91.)
Defendant maintains that he was impartial during the hearing and
assigned an investigative employee to assist Bryant in interviewing
witnesses.  (Id. Attach. #4 Decl. Trujillo, at 2.)  Trujillo states
that he read the witness interviews and Bryant's written statement,
and Trujillo permitted Plaintiff to question the reporting officer,
Lizarraga, during the hearing.  (Id.)

Bryant argues that Trujillo retaliated by refusing Plaintiff's
requests to call defense witnesses and then misrepresenting that
Bryant merely chose not to call any witnesses.  (Pl.'s Mot. Summ.
J. Decl. Bryant 40-41, ECF No. 92.)  When Plaintiff appealed
Trujillo's finding on October 8, 2008, Defendant misrepresented the
facts again by stating that he allowed Bryant to call witnesses.
(Id. at 42.)  Yet, in his subsequent discovery responses, Trujillo
stated that "'there was no need to bring witnesses to the
hearing.'"  (Id. at 43.)

As an initial matter, it does not appear that Trujillo
disputes that Bryant engaged in conduct that was constitutionally
protected or that Trujillo's conduct can constitute an adverse

action, which would satisfy two elements of a retaliation claim. See Watison, 668 F.3d at 1114. Trujillo does, however, dispute that the disciplinary hearing was conducted to retaliate against Plaintiff for constitutionally protected activity. He also disputes that threatening conduct occurred. A genuine issue of fact exists as to causation, whether the Defendant's conduct would chill protected activity, and whether Trujillo's actions furthered a legitimate penological interest. These elements of Bryant's retaliation claim cannot be resolved on the evidence before the Court. Consequently, neither Bryant nor Trujillo is entitled to summary judgment. The Defendant's Motion for Summary Judgment on the retaliation claim against him in count three should be **DENIED**. Likewise, Bryant's Motion for Summary Judgment should be **DENIED**.

### d. Catlett

Defendant Catlett seeks summary judgment on Bryant's claim that by denying his inmate appeals regarding Lizarraga's retaliatory cell moves, Catlett sanctioned Lizarraga's retaliatory conduct. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 27, ECF No. 91.) Catlett argues that his only involvement was interviewing Plaintiff in response to his inmate appeals, and therefore there is no evidence that he sanctioned Lizarraga's purportedly retaliatory conduct. (Id.)

Bryant states that Catlett knew Plaintiff had filed a grievance against Lizarraga for discriminating and retaliating through cell transfers. (Pl.'s Mot. Summ. J. 17-18, ECF No. 92 (referencing grievance log Cal-A-08-01027); see id. Attach. #1 Ex. 14, at 70-72 (indicating that this grievance was filed against Lizarraga only).) Correctional Sergeant Catlett "endorsed"

Lizarraga's false disciplinary report by signing it as the reviewing officer, and he was with Lizarraga on July 7, 2008, when they discussed double celling, and Catlett "authorized the racially motivated retaliatory cell move" to ASU #1.  (Pl.'s Mot. Summ. J. 18, ECF No. 92; id. Attach. #2 Ex. 23, at 59.)  Catlett also falsified information at his first level of review of Bryant's grievance against Lizarraga when Catlett stated that he interviewed Bryant on July 27, 2008, but in his discovery responses, Catlett stated that he could not recall whether he interviewed Plaintiff. (Id. Decl. Bryant 39.)

In his Opposition to Catlett's Motion for Summary Judgment, Bryant also states that Catlett falsified a chrono indicating that on July 2, 2008, Plaintiff told other inmates that they would be moved to ASU #1 if they accepted a cellmate, but they could stay in ASU #2 if they refused.  (Pl.'s Opp'n Defs.' Mot. Summ. J. 24, ECF No. 101.)  According to Plaintiff, Catlett's reason for issuing the chrono and recommending that Bryant be transferred to ASU #1 was pretextual because Plaintiff's statements to other inmates did not violate any institutional rule and were protected by the First Amendment.  (Id. at 25.)

Some of the elements of Bryant's retaliation claim are not disputed.  First, Bryant exercised his First Amendment right to file grievances, which is a protected activity.  Watison, 668 F.3d at 1114.  Second, Catlett took adverse action against Plaintiff. Id.  This Defendant issued an informational chrono that detailed his request that Bryant be transferred to ASU #1.  (Defs.' Mot. Summ. J. Attach. #5 Decl. Catlett 3, ECF No. 91; see id. Ex. G, at 7.)  He signed the rules violation report that was issued by his

subordinate, Officer Lizarraga. (Id. Attach. #5 Decl. Catlett 4.)
But signing the report is not an adverse action that would support
a retaliation claim.  The Defendant contests to some degree that he
misrepresented that he had interviewed Bryant; Catlett states in an
interrogatory responses that he does not recall whether he or
someone else personally interviewed Plaintiff.  Nonetheless, this
is not a material issue of fact sufficient to preclude summary
judgment for Defendant Catlett.  See Liberty Lobby, Inc., 477 U.S.
at 248 (stating that material issues are those that might influence
the outcome of the lawsuit under governing law).

     But the evidence does conflict as to whether there is a causal
connection between the protected conduct - filing a grievance
against Lizarraga on May 28, 2008 - and Catlett's July 2, 2008
chrono.  See Watison, 668 F.3d at 1114.  It is unclear whether
Catlett knew that Bryant had submitted a grievance against
Lizarraga on May 28, 2008, before Plaintiff was transferred to ASU
#1 on July 7, 2008.  Nonetheless, the parties do not dispute that
Catlett was with Lizarraga on July 2, 2008, when Lizarraga informed
Bryant that he needed to accept a cellmate.  (Defs.' Mot. Summ. J.
Attach. #5 Decl. Catlett 3, ECF No. 91; see id. Ex. G, at 7.)  It
is also undisputed that on July 7, 2008, Catlett issued an
informational chrono referring to the cellmate incident and
requesting that Bryant be transferred to ASU #1.  (Id. Attach. #5
Decl. Catlett 3-4; see id. Ex. G, at 7.)

     On July 2, 2008, Catlett heard Lizarraga inform Plaintiff that
he needed to accept a cellmate and that if he refused, Lizarraga
would have to issue a rules violation.  (Id. at 3; id. Ex. G, at
7.)  Plaintiff refused and began encouraging other inmates to do

the same.  (Id. at G, at 7.)  Catlett states, "Plaintiff refused an order, and I knew that Lizarraga would follow policy and issue Plaintiff a Rules Violation Report (RVR) for the violation.  On July 7, 2008, I wrote a CDC 128 Informational Chrono to document what I witnessed in support of the forthcoming RVR."  (Id. Attach. #5 Decl. Catlett 3; see id. Ex. G, at 7.)  That same day, Catlett completed a form approving Bryant for transfer to ASU #1.  (Id. at 5.)  Catlett represents that he was responding to a request from ASU #1 staff for an inmate transfer.  (Id. at 4.)

     Sergeant Catlett's authority to transfer inmates is unclear. In his Declaration, Catlett states, "I thought it was appropriate to transfer Plaintiff to ASU 1.  Therefore, I approved Plaintiff for transfer to ASU 1 that day."  (Defs.' Mot. Summ. J. Attach. #5 Decl. Catlett 4-5, ECF No. 91 (emphasis added).)  Yet, in the informational chrono dated July 7, 2008, Catlett wrote, "I am requesting that Inmate Bryant be rehoused in ASU#1 as his continued presence in ASU #2 is a disruptive force as he encourages other Inmates to resist double celling within ASU#2."  (Id. Ex. G, at 7 (emphasis added); see also id. Ex. H, at 9.)

     There is a genuine issue of material fact as to whether a sufficient causal connection exists between Plaintiff's grievance against Lizarraga and Catlett's informational chrono and cell transfer order.  The jury should also decide whether Catlett's actions would chill a person of ordinary firmness and whether they furthered a legitimate penological interest.  See Watison, 668 F.3d at 1114.  Catlett's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment on the retaliation claim against Catlett in ground three should both be DENIED.

###### e.   Ochoa and Janda

Then-Chief Deputy Warden Ochoa and former Associate Warden Janda argue that the retaliation claims against them in count three fail as a matter of law. (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 27, ECF No. 91; see id. Attach. #3 Decl. Janda 2; id. Attach. #6 Decl. Ochoa 1.)  Ochoa is alleged to have sanctioned the other Defendants' misconduct by instructing the appeals coordinator to screen out Bryant's grievance regarding Lizarraga's cell transfers. (Id. Attach. #1 Mem. P. & A. 27.)  Defendants Ochoa and Janda purportedly ratified the racial discrimination of Defendants Armstrong, Lizarraga, and Trujillo through Ochoa's denials of Plaintiff's grievances.  (Id.)  Ochoa and Janda argue that these claims are merely based on the fact that, as supervisors, they reviewed and responded to Bryant's inmate appeals.  (Id. at 27-28.)

In their declarations, both Defendants assert that they did not screen out or refuse to process any of Bryant's appeals.  (Id. Attach. #3 Decl. Janda 2 (affirmatively stating so); id. Attach. #6 Decl. Ochoa 2 (indicating that he has no recollection of screening out any grievance).)  Ochoa and Janda state that they reviewed the appeals based on the information provided to them, and Janda submits that there is no evidence that he denied the appeals in retaliation.  (Id. Attach. #3 Decl. Janda 2; id. Attach. #6 Decl. Ochoa 3.)

The Plaintiff does not oppose Defendant Ochoa's Motion for Summary Judgment, but he seeks summary judgment on his retaliation claim against Defendant Janda.  (See generally Pl.'s Mot. Summ. J. 15-20, ECF No. 92; see id. at 19-20.)  According to Bryant, by signing Lizarraga's false disciplinary report, which was unfairly

adjudicated by Trujillo, Janda ratified Lizarraga's and Trujillo's misconduct.  (Id. Decl. Bryant 44; see Defs. Mot. Summ. J Attach. #4 Decl. Trujillo Ex. F, at 5, ECF No. 91.)  Bryant states that Defendant Janda was aware of two retaliatory cell moves (June 7, 2007, and July 7, 2008) and that he conducted the Institutional Classification Committee review that resulted in the June 2007 transfer of Plaintiff to ASU #2, yard group two.  (Pl.'s Mot. Summ. J. Decl. Bryant 44-45, ECF No. 92.)

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'"  Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011), cert. denied, __ U.S. __, 132 S. Ct. 2101 (2012) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)).  A causal connection is established if a defendant sets in motion a series of acts by others or knowingly refuses to terminate a series of acts by others that the supervisor reasonably should have known would lead to a constitutional violation.  Starr, 652 F.3d at 1207-08 (citing Dubner v. City & County of San Francisco, 266 F.3d 959, 968 (9th Cir. 2001)).  "'A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'"  Id. at 1208 (quoting Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998)).

The claim against Ochoa is that he sanctioned the Defendants' misconduct by causing Bryant's grievance to be screened out.  The Defendant completed the second level review for four different grievances submitted by Plaintiff.  (Defs.' Mot. Summ. J. Attach. #6 Decl. Ochoa 2-3, ECF No. 91.)  "I don't recall screening-out any inmate appeals filed by Plaintiff that are mentioned in the Second Amended Complaint."  (Id. at 2.)  In opposing Ochoa's Motion for Summary Judgment, Bryant does not present any arguments or evidence showing that Ochoa retaliated against him.  See Celotex, 477 U.S. at 324 (requiring that to withstand summary judgment, the opposing party must produce competent evidence that establishes genuine issues for trial).

Bryant belatedly attempts to oppose Ochoa's Motion in his supplemental memorandum and declaration.  (Pl.'s Suppl. Mem. P. & A. Opp'n Defs.' Mot. Summ. J. 5, ECF No. 113.)  He argues that although Ochoa indicated that he did not review any specific policy when denying Bryant's appeals, Defendant later identifies a prison policy "that would support" Ochoa's denial.  (Id.; Pl.'s Suppl. Decl. Opp'n Defs.' Mot. Summ. J. Ex. 40, at 33-49, ECF No. 115.)  Bryant's assertion that Ochoa reviewed the antidiscrimination policies identified in discovery responses adds little to the claim against Defendant Ochoa.  (See Pl.'s Suppl. Mem. P. & A. Opp'n Defs.' Mot. Summ. J. 5, ECF No. 113.)  Plaintiff has not provided the type of evidence sufficient to preclude summary judgment. There is no material triable issue, and Ochoa's Motion should be **GRANTED**.

As to Defendant Janda, on October 7, 2008, he signed the rules violation report that was written by Lizarraga three months

earlier; Janda signed in place of Associate Warden S. Anderson, who was not available to sign the report.  (Defs.' Mot. Summ. J. Attach. #3 Decl. Janda 3, ECF No. 91; see id. Attach. #4 Decl. Trujillo Ex. F, at 5.)  Janda states, "I signed the RVR as a reviewer.  My task was to review the written report for specificity and completeness and to spot other issues such as timeliness and due process issues."  (Id. Attach. #3 Decl. Janda 3.)  Unlike the circumstantial evidence that Defendant Catlett knew of Lizarraga's misconduct because he directly supervised Lizarraga, issued a chrono against Bryant, and transferred Plaintiff to yard one, there is no evidence that Janda knew Lizarraga may have had a retaliatory motive.  (See id. Attach. #3 Decl. Ochoa 3 (submitting that the correctional sergeants directly supervised Defendants Armstrong or Lizarraga).)

As chairperson of the Institution Classification Committee, Janda participated in the decision to transfer Plaintiff from ASU #1 to ASU #2 on June 7, 2007, which was seven days after Bryant served Janda with a summons and complaint in different civil action pending before the court.  (Id. at 4; Pl.'s Mot. Summ. J. Decl. Bryant 44-45, ECF No. 92.)  Also, Bryant submits that Janda knew that Lizarraga transferred Plaintiff in retaliation a second time from ASU #2 to ASU #1 on July 7, 2008.  (Id. at 45.)

Bryant points to no evidence indicating how Janda knew about, or was involved with, a racially motivated and retaliatory cell transfer on June 7, 2007.  The events giving rise to this action occurred after June 7, 2007.  Consequently, they cannot be the basis for a retaliatory transfer before that date.  Furthermore, there is nothing in the record showing how Janda's position as

chairperson affected any subsequent cell moves or how Janda was involved with Lizarraga's July 2008 allegedly retaliatory transfer. Bryant attempts to establish Janda's liability because, as a supervisor, he signed off on a report that Janda reviewed for completeness and timeliness.  (Defs.' Mot. Summ. J. Attach. #3 Decl. Janda 3, ECF No. 91.)

Plaintiff has presented no evidence that reasonably supports a conclusion that former-Associate Warden Janda retaliated against him for engaging in constitutionally-protected conduct.  The eleventh-hour assertion that Janda retaliated against Plaintiff after Janda was served with a summons for a separate lawsuit is unrelated to the allegations in the Second Amended Complaint. There is no basis to conclude that Janda harbored a retaliatory intent or was aware of Defendants Lizarraga and Trujillo's misconduct.  See Starr, 652 F.3d at 1207-08.  Janda's Motion for Summary Judgment on the retaliation claim in count three should be **GRANTED**.  Plaintiff's Motion for Summary Judgment should be **DENIED**.

**D.**   **Count Four:  California Civil Code Sections 52.1, 51.7, and 52(b) (Armstrong, Lizarraga, and Trujillo)**

Finally, Defendants Armstrong, Lizarraga, and Trujillo move for summary judgment on the state law claims against them in count four.  (Defs.' Mot. Summ. J. Attach. #1 Mem. P. & A. 29, ECF No. 91.)  California Civil Code section 52.1 provides a cause of action for any person whose rights were interfered with, or were attempted to be interfered with, by another.  Cal. Civ. Code § 52.1(b) (West 2010); Cabesuela v. Browning-Ferris Indus. of Cal., 68 Cal. App. 4th 101, 110, 80 Cal. Rptr. 2d 60, 64-65 (1998).

California Civil Code § 52.1, commonly known as the Bane Civil Rights Act, provides that "[a]ny individual

50

> whose exercise or enjoyment of rights secured by the
> Constitution or laws of the United States, or of rights
> secured by the Constitution or laws of this state, has
> been interfered with, or attempted to be interfered with
> [by threats, intimidation, or coercion], may institute
> and prosecute . . . a civil action for damages."

Fernandez v. Morris, No. 08-CV-0601 H(PCL), 2008 U.S. Dist. LEXIS

54298, at *23 (S.D. Cal. July 16, 2008) (quoting Cal. Civ. Code §

52.1(b)).

To state a claim under section 52.1, "the statutory language

clearly requires only 'threats, intimidation, or coercion.'"

Moreno v. Town of Los Gatos, 267 F. App'x 665, 669 (9th Cir. 2008).

Some courts have suggested that a plaintiff must also establish the

existence of violence or intimidation by threat of violence.  See

Fernandez, 2008 U.S. Dist. LEXIS 54298, at *23 (quoting Cabesuela,

68 Cal. App. 4th at 111, 80 Cal. Rptr. 2d at 65); Rabkin v. Dean,

856 F. Supp. 543, 552 (N.D. Cal. 1994) (citing Cal. Civ. Code §

52.1(j)) ("[T]he statute is meant to protect against violence or

the threat of violence.")  The Ninth Circuit, however, has

concluded that requiring violence or a threat of violence "is no

longer a correct interpretation of section 52.1's requirements."

Moreno, 267 F. App'x at 666.

By way of contrast, California Civil Code section 51.7

provides that persons have the right to be free from violence or

threats of violence resulting from their membership in a protected

class.  Cal. Civ. Code § 51.7(a); Cabesuela, 68 Cal. App. 4th at

111, 80 Cal. Rptr. 2d at 65 (citing Boccato v. City of Hermosa

Beach, 29 Cal. App. 4th 1797, 1809, 35 Cal. Rptr. 2d 282, 290

(1994)).  California Civil Code section 52(b) describes the

available remedies for a violation of section 51.7, which include

"actual damages, punitive damages, a civil penalty of $25,000 per

1   plaintiff, attorney's fees and injunctive relief."  Pinzon v.

2   Jensen, No. 1:08-cv-1543 AWI GSA, 2009 U.S. Dist. LEXIS 11185, at

3   *17 (E.D. Cal. Jan. 30, 2009); see Cal. Civil Code § 52(b).

4       1.   Armstrong, Lizarraga, and Trujillo

5       These three Defendants argue that the evidence proves they did

6   not threaten or intimidate Plaintiff; rather, they were merely

7   performing their job duties to house and guard Bryant, as well as

8   adjudicate his rules violation. (Defs.' Mot. Summ. J. Attach. #1

9   Mem. P. & A. 29, ECF No. 91.)  There is no evidence, the Defendants

10  contend, that they acted or made threats based on Plaintiff's race;

11  in fact, Bryant's claim is that Armstrong, Lizarraga, and Trujillo

12  made threats because Plaintiff filed grievances against them.

13  (Id.)  Although the Plaintiff does not move for summary judgment on

14  these claims, he opposes Defendants' Motion. (See Pl.'s Opp'n

15  Defs.' Mot. Summ. J. 28-30, ECF No. 101.)

16      The California Supreme Court has explained that to prevail on

17  a claim under section 52.1, a plaintiff must establish "an

18  attempted or completed act of interference with a legal right,

19  accompanied by a form of coercion." Jones v. Kmart Corp., 17 Cal.

20  4th 329, 334, 949 P.2d 941, 943-44, 70 Cal. Rptr. 2d 844, 847

21  (1998).  Federal courts have held that "[t]he word 'interferes' as

22  used in 52.1 means 'violates.'" Cameron v. Buether, No.

23  09-CV-2498-IEG(WMc), 2010 U.S. Dist. LEXIS 27276, at *12 (S.D. Cal.

24  Mar. 23, 2010) (quoting Austin V. v. Escondido Union Sch. Dist.,

25  149 Cal. App. 4th 860, 883, 57 Cal. Rptr. 3d 454, 472 (2007)).

26  "The essence of a Bane Act claim is that the defendant, by

27  'threats, intimidation or coercion,' tried to or did prevent the

28  plaintiff from doing something he or she had the right to do under

the law, or to force the plaintiff to do something that he or she was not required to do under the law." Shoval v. San Diego County, No. 09-CV-01348-H (JMA), 2009 U.S. Dist. LEXIS 77723, at *10 (S.D. Cal. Aug. 31, 2009) (quoting Kmart Corp., 17 Cal. 4th at 334, 949 P.2d at 943-44, 70 Cal. Rptr. 2d at 847).

Bryant asserts that Defendant Armstrong interfered with his First and Fourteenth Amendment rights with verbal threats of violence because of his membership in a protected racial class. (Pl.'s Opp'n Pl.' Mot. Summ. J. Decl. Bryant 61, ECF No. 101.) Specifically, Armstrong intimidated Bryant with verbal threats of violence by telling Plaintiff he would get "taken care of and would not safely walk the prison yard" if he continued to pursue grievances against Armstrong for discrimination. (Id.) The Defendant, in contrast, testifies, "I never threatened or intimidated Plaintiff." (Defs. Mot. Summ. J. Attach. #2 Decl. Armstrong 8, ECF No. 91.) The jury must evaluate the parties' credibility to determine whether Armstrong made these threats.

In his Declaration, Plaintiff also claims that Defendant Armstrong threatened him when she authored a chrono "suggesting that [Bryant's] safety could be in jeopardy." (Pl.'s Opp'n Defs.' Mot. Summ. J. 61, ECF No. 101.) Yet, in the July 8, 2008 chrono, Armstrong described various comments Bryant had made in front of other inmates regarding her "showing favoritism to other races." (Id. Attach. #1 Ex. 8, at 40.) The Defendant also wrote: "Bryant makes most of these comments in front of other inmates. I feel that this could possibly jeopardize [Bryant's] safety. I also feel that Inmate Byant's resentment towards me could lead to him becoming assaultive towards me based on his extensive past Staff

assaultive history." (Id.)  It is for the jury to decide whether the reference to Bryant jeopardizing his safety should be construed as a threat of violence or a form of coercion.

As to Lizarraga, the Plaintiff represents that Lizarraga similarly interfered with his First and Fourteenth Amendment rights with verbal threats of violence because of Bryant's membership in a protected racial class.  (Id. Decl. Bryant 61.)  Defendant told Bryant he would make sure Plaintiff was "taken care of" and would not be able to safely walk the yard if Plaintiff continued to pursue grievances for discrimination.  (Id.)

Plaintiff speculates that on July 7, 2008, after Bryant tendered his grievance against Lizarraga for discriminatory and retaliatory cell transfers, Lizarraga disposed of some of Plaintiff's legal documents while moving him to ASU #1.  (Id. at 61-62.)  The Defendant testifies, in contrast, that he "never threatened or attempted to intimidate Plaintiff." (Defs.' Mot. Summ. J. Attach. #7 Decl. Lizarraga 5, ECF No. 91.)  Lizarraga also submits that on July 7, 2008, he escorted Bryant to a holding cell in ASU #2 for the transfer to ASU #1, but did not escort him to ASU #1 or take his property.  (Id.)  Bryant's speculation about missing property does not constitute evidence that would defeat Lizarraga's Motion for Summary Judgment.  Nevertheless, other evidence conflicts, and Lizarraga is not entitled to summary judgment.

Finally, Bryant contends that Defendant Trujillo intimidated Plaintiff with the threat of physical violence when he called Hispanic officers into the office to surround Plaintiff in a "menacing manner." (Pl.'s Opp'n Defs.' Mot. Summ. J. Decl. Bryant //

63, ECF No. 101.)  Trujillo denies that allegation:

> I never threatened or attempted to intimidate
> Plaintiff.  I did not call any officers or staff into the
> RVR hearing in order to threaten or intimidate Plaintiff
> for any reason.  Specificlaly, I did not call three
> Hispanic officers into the RV hearing to harass,
> intimidate, or threaten Plaintiff.  I never witnessed any
> officers or staff threaten or attempt to intimidate
> Plaintiff.  I never engaged in or made any
> racially-motivated attacks or threats against Plaintiff.

(Defs.' Mot. Summ. J. Attach. #4 Decl. Trujillo 3, ECF No. 91.)
This claim cannot be resolved by weighing conflicting declarations.
When ruling on a motion for summary judgment, "[t]he evidence of
the nonmovant is to be believed, and all justifiable inferences are
to be drawn in his favor."  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 255.

For these reasons, Defendants Armstrong, Lizarraga, and
Trujillo's Motion for Summary Judgment on the state law claims in
count four should be **DENIED**.

### IV.   CONCLUSION

The Defendants' Motion for Summary Judgment [ECF No. 91]
should be **GRANTED in part** and **DENIED in part**.  Bryant's Motion for
Summary Judgment should be **DENIED**.

As to the equal protection cause of action in count one
against Defendant Armstrong, there is a genuine issue of material
fact, and summary judgment on a class-wide theory for neither party
is appropriate and should be **DENIED**.  But Armstrong's Motion for
Summary Judgment for the equal protection cause of action on a
class-of-one theory should be **GRANTED**.  Plaintiff's Motion for
Summary Judgment should also **DENIED**.

With respect to count two, Defendant Armstrong is also not
entitled to summary judgment on the retaliation claim against her.

Armstrong's Motion for Summary Judgment should be **DENIED,** and
Bryant's Motion for Summary Judgment should also be **DENIED.**

In count three, there is a genuine issue of material fact for
the equal protection cause of action against Defendant Lizarraga.
His Motion for Summary Judgment should be **DENIED**, and Bryant's
Motion should be **DENIED.**  Similarly, Bryant is not entitled to
summary judgment for the equal protection claim against Trujillo in
count three, and Plaintiff's Motion should be **DENIED.**  Trujillo did
not seek summary judgment on this aspect of count three.

Bryant does not attempt to establish a retaliation cause of
action in count three against Armstrong, and her Motion for Summary
Judgment should therefore be **GRANTED.**  There is an issue of fact
with respect to whether Defendant Lizarraga retaliated against
Bryant; Defendant Lizarraga's Motion for Summary Judgment should be
**DENIED.**  Plaintiff's Motion on this claim should also be **DENIED.**
Defendant Trujillo is not entitled to summary judgment on the
retaliation claim in count three.  Plaintiff's and Defendant
Trujillo's Motions should both be **DENIED.**  Defendant Catlett is not
entitled to summary judgment on the retaliation claim in count
three.  Thus, Catlett's Motion for Summary Judgment as well as
Bryant's Motion for Summary Judgment should be **DENIED.**  Defendants
Ochoa and Janda are both entitled to summary judgment on the
retaliation claims against them in count three, and their Motion
for Summary Judgment should be **GRANTED.**  Bryant has not moved for
summary judgment against Defendant Ochoa.  Plaintiff Bryant's
Motion for Summary Judgment concerning Janda's retaliatory conduct
alleged in count three should be **DENIED.**

1    Finally, with respect to the California Civil Code violations

2   asserted in count four, there are material issues of fact as to

3   whether Defendants Armstrong, Lizarraga, and Trujillo are liable.

4   Their Motion for Summary Judgment should be **DENIED.**

5    This Report and Recommendation will be submitted to the United

6   States District Court judge assigned to this case, pursuant to the

7   provisions of 28 U.S.C. § 636(b)(1).  Any party may file written

8   objections with the Court and serve a copy on all parties on or

9   before August 29, 2012.  The document should be captioned

10  "Objections to Report and Recommendation."  Any reply to the

11  objections shall be served and filed on or before September 12,

12  2012.  The parties are advised that failure to file objections

13  within the specified time may waive the right to appeal the

14  district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

15  1991).

16

17  DATE:  August 3, 2012

18                                    RUBEN B. BROOKS
                                United States Magistrate Judge
19

20  cc:  Judge Whelan
         All Parties of Record

21

22

23

24

25

26

27

28